## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

DENISE ONTIVEROS,

       Plaintiff,

v.                                        No. Civ. 12-729 LH/WPL

BIOTEST PHARMACEUTICALS
CORPORATION,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

On April 1, 2013, Defendant Biotest Pharmaceuticals Corporation ("Defendant" or "Biotest") filed a Motion and Memorandum Brief for Summary Judgment (ECF No. 44). The Court, having considered the motion, briefs, evidence, relevant law, and otherwise being fully advised, concludes that Defendant's motion for summary judgment should be granted in part and denied in part as described herein.

## I.    FACTUAL BACKGROUND

### A.    Plaintiff's Employment and Termination at Biotest

Plaintiff formerly worked for Talecris at the Santa Fe Center. *See* Def.'s Mot., Ex. B, Interrog. No. 10, ECF No. 44-2 at 5 of 8. When Talecris sold the Santa Fe Center to Biotest, Plaintiff elected to stay and be part of the buyout agreement between Talecris and Biotest. *See id.* Plaintiff worked as a Quality Assurance ("QA") Specialist II at Biotest in the Quality Assurance-Plasma Department. *See* Def.'s Mot., Ex. B, Interrog. No. 1, ECF No. 44-2; Pl.'s Ex. 5 at Dep. Ex. 4, ECF No. 49-9 at 4 of 8. On March 11, 2010, Plaintiff underwent a performance evaluation in which she was given an overall performance rating of "Fully Meets" expectations

during the past year.  *See* Pl.'s Ex. 5 at Dep. Ex. 4, ECF No. 49-9 at 4-7 of 8.

On April 22, 2010, a tech brought to Plaintiff's attention a potential issue with a C-cell reservoir.  *See* Pl.'s Ex. 1 at 102:5-18, ECF No. 49-2.  The C-Cell reservoir is manufactured by a company called Fenwal that is a vendor and supplier to Biotest.  *See id.* at 106:1-3.  The C-Cell reservoir and the tubing attached thereto are used on a plasma freeze machine.  *See* Def.'s Mot., Ex. A at 95:4-21, ECF No. 44-1.  The reservoir has an area where a needle is attached and the needle is inserted into a person's vein.  *See id.*  The reservoir has the suction, which is a centrifuge system that separates the red blood cells and the plasma.  *Id.*  The suction drops the red blood cells into the reservoir, drops the plasma into a bottle, and then once the reservoir hits a certain limit of red blood cells, the sensor shuts off the extraction of blood and returns the red blood cells back into the vein through a connection at the bottom.  *See id.* at 95:4-21, 96:22-97:6. The tech found what looked like glue inside the C-cell reservoirs, so Plaintiff and other managers segregated the reservoirs from the ones that were used on the donor floor.  *See* Pl.'s Ex. 1 at 102:5-103:6, ECF No. 49-2.  The C-cell reservoirs appeared to have a bridge of glue between an exterior wall and an internal filter.  *See* Def.'s Mot., Ex. A at 97:11-25, ECF No. 44-1.

Plaintiff immediately sent an email to her boss, Dora Cartaya, and other quality assurance specialists to examine and quarantine the C-cells.  *See* Pl.'s Ex. 1 at 103:7-12, ECF No. 49-2. Ms. Cartaya responded to Plaintiff by email, copying Heather Hermann from the Biotest quality unit in Iowa City.  *See id.* at 104:17-25.  Ms. Cartaya's email stated, "Seen something similar in Iowa City before, long time ago."  *Id.*  She advised Plaintiff to check with Ms. Hermann.  *Id.*

Ms. Hermann sent an email to Plaintiff saying that they had the same problem, that she had a memo from Fenwal stating that the adhesive is inert, and that she would send Plaintiff a copy of the memo.  *See id.* at 105:1-9.  Plaintiff received the Fenwal memo, which stated, "The

Fenwal Assembly Plant fastens the reservoir cap to the body using a liquid solvent." *See id.* at 105:7-106:13.   Plaintiff was not satisfied with Fenwal's explanation and did not believe Fenwal's assertion to be true, because the reservoirs Plaintiff observed showed that there was a bridge and Plaintiff did not believe a solvent could create a bridge because it would evaporate.   *See id.* at 106:10-107:8.   Plaintiff also received a Fenwal Technical Information Document.   Def.'s Reply, Ex. B at 117:13-24 & Ex. 36, ECF No. 58-2 at 4, 21-22 of 22.   The document said that a liquid solvent was used in the manufacturing process.   *See id.*, Ex. B at Ex. 36, ECF No. 58-2 at 21-22 of 22.   Plaintiff briefly researched the glue versus solvent issue on the internet by looking up how the devices are manufactured and what is used on them.   Pl.'s Ex. 1 at 115:11-116:8, ECF No. 49-3.   Her research indicated that one could not bond these two components together without using some sort of adhesive, such as rubber or plastic, in addition to the solvent.   *See id.*

On April 24, 2010, Ms. Cartaya sent an email to Plaintiff and Heather Hermann asking Ms. Hermann for the Fenwal contact information.   *See* Pl.'s Ex. 1 at 107:9-18, ECF No. 49-2. Ms. Cartaya asked Plaintiff whether she could visually inspect the kits and confirm whether the defect is the same described in the Fenwal memo.   *Id.*   Plaintiff did so and concluded that it was not the same defect.   *Id.* at 107:16-22.   She sent an email to Ms. Cartaya and Ms. Hermann saying, "It is absolutely glue.   It dripped down the front of the chamber."   *Id.* at 107:23-108:1. Plaintiff believed it was not a solvent because it formed a bridge.   *See id.* at 109:19-110:1.

On April 27, 2010, Plaintiff sent an email to corporate personnel regarding the glue versus solvent issue asking why the vendor was not being audited.   *Id.* at 112:8-11.   Plaintiff believed that a solvent would not be used to bond the plastic together, because a solvent is not an adhesive.   *See id.* at 113:4-12; Pl.'s Ex. 1 at 115:23-116:8, ECF No. 49-3.   According to Plaintiff, glues or adhesives have to have an epoxy component to them, and solvents are not that by nature;

3

rather, a solvent might activate a plastic or rubber, but Fenwal would not use a solvent to bond parts together.  *See* Pl.'s Ex. 1 at 113:4-12, ECF No. 49-2.  Plaintiff never received an answer to her question regarding whether Fenwal had been audited.  *Id.* at 114:3-5, ECF No. 49-3.  She also never received an answer to the question of what studies Fenwal had to validate that having this substance inside the reservoir was harmless to the integrity of the unit.  *See id.* at 114:21-25.

On May 3, 2010, Ms. Cartaya sent Plaintiff an email that stated:  "Fenwal does not use glue or adhesive to put the components together," and, "It is okay to use the kits as long as these stains are not on the level sensor points along the back channel of the reservoir."  *Id.* at 110:24-111:15, ECF No. 49-2.  Plaintiff did not believe these statements to be accurate because you can see through a solvent stain, but not necessarily through a glue drip.  *See id.* at 111:10-18.  Ms. Cartaya also instructed Plaintiff and Heather Hermann to refer to the cosmetic defect as solvent marks or solvent drip, not as adhesive or glue drip marks.  *Id.* at 120:7-11, ECF No. 49-3.

That same day, Plaintiff was instructed to call Ms. Cartaya, which she did.  *Id.* at 121:2-21, ECF No. 49-3.  Ms. Cartaya screamed and yelled at Plaintiff, telling Plaintiff that she embarrassed herself by questioning a very trusted Federal Drug Administration ("FDA") approved vendor, that she obviously did not know how to do her job, and that she was questioning people who do know how to do their jobs.  *Id.*  Ms. Cartaya was referring to Plaintiff's April 27th email and asked why Plaintiff could not just let it go.  *Id.* at 121:24-122:2.

On May 5, 2010, Plaintiff called Mark Felici with the Human Resources Department to report the abusive and insulting conversation she had with Ms. Cartaya on May 3rd.  *Id.* at 129:14-25.  Mr. Felici brushed it off and said it was a personality conflict and that Plaintiff should talk to Janice Smith about it.  *See id.* at 129:14-25, ECF No. 49-3 & 130:1-13, ECF No. 49-4.  Plaintiff called and left a message with Ms. Smith but she never heard back from her.  *See*

*id.* at 130:11-17, ECF No. 49-4.

The FDA regulates Biotest and allows them to operate.  *See* Def.'s Mot., Ex. A at 94:17-24, ECF No. 44-1.  Plaintiff, using her personal cellular phone, called Betsy Poindexter of the FDA on May 5, 2010, and spoke with her about the reservoir issue.  *See* Pl.'s Ex. 1 at 130:18-132:24, ECF No. 49-4.  Plaintiff asked Ms. Poindexter if Plaintiff was making a big deal out of nothing, if there was a safety issue, or if she should let it go.  *See id.*  Ms. Poindexter told Plaintiff to send her the Fenwal technical document.  *Id.*  Plaintiff spoke with Ms. Poindexter again on May 10, 2010, and in a separate call on May 11, 2010, Ms. Poindexter responded that it was a legitimate issue that needed to be examined.  *See id.* at 134:6-135:1, ECF No. 49-4; Def.'s Mot., Undisputed Fact ("UF") ¶ 11, ECF No. 44.

On May 10, 2010, Ms. Cartaya made arrangements to travel to Santa Fe to perform a skills assessment, or performance evaluation, on Plaintiff.  *See* Pl.'s Ex. 1 at 136:11-17, ECF No. 49-4; Pl.'s Ex. 2, ECF No. 49-6.  The performance evaluation happened to coincide with a surgical procedure that Plaintiff had scheduled.  Def.'s Mot., UF ¶ 16, ECF No. 44.  Biotest notified Plaintiff of the skills assessment in time for her to have re-scheduled the surgery so that she could have been present when Ms. Cartaya conducted her skills assessment.  *Id.*, UF ¶ 17.  Although Plaintiff could have rescheduled her surgery date, she did not reschedule it.  *See* Def.'s Mot., Ex. A at 176:16-177:10, ECF No. 44-1; Pl.'s Ex. 1 at 136:11-17, ECF No. 49-4.

On May 12, 2010, Ms. Cartaya sent a memorandum to Plaintiff documenting the May 3, 2010 conversation.  Pl.'s Ex. 1 at 123:2-124:8, ECF No. 49-3.  Among other things, Ms. Cartaya stated:  "In the future, you consult with me before issuing to a wide distribution an e-mail in which you question the validity of a supplier's technical information documents or their expertise to manufacture and distribute their products."  *Id.*  Plaintiff did not believe this request

to be reasonable because neither Ms. Cartaya nor a representative of Fenwal had looked at Plaintiff's sample, which Plaintiff believed was not just a solvent stain.  *Id.* at 124:1-125:1. Plaintiff attempted to send to Ms. Cartaya an example or picture but she refused to consider it. *See id.*

On May 13, 2010, Plaintiff called Ms. Poindexter again and explained that there was enough glue in the reservoir that it created a bridge, and Plaintiff was afraid the piece of glue could come loose and go into a donor's vein, since there was no filter.  *Id.* at 135:5-16, ECF No. 49-4.  Plaintiff asked if this would be a bad thing, and Ms. Poindexter agreed that it absolutely would be a bad thing.  *Id.*  Plaintiff also had a conversation with Ms. Poindexter on May 20, 2010.  Def.'s Mot., UF ¶ 11, ECF No. 44.

Plaintiff, however, never told anyone at Biotest about her conversations with Betsy Poindexter.  *Id.*, UF ¶ 12; Def.'s Mot., Ex. A at 148:15-17, ECF No. 44-1.  During her employment, Plaintiff made her communications with the FDA using her personal cell phone and she sent documents to the FDA using her personal fax machine.  Def.'s Mot., UF ¶ 13, ECF No. 44.

On May 17, 2010, Dora Cartaya and Diana Lozano, a Quality Assurance Specialist from Florida, arrived at the Santa Fe Center to perform Plaintiff's skills assessment, which occurred while Plaintiff was out having her surgery.  *See* Pl.'s Ex. 1 at 136:11-17, ECF No. 49-4; Pl.'s Ex. 3 at 51:24-52:5, ECF No. 49-7.  On May 18, 2010, Ms. Cartaya was irate, yelling that Plaintiff keeps calling it glue and it is not glue, and was told to calm down by corporate staff.  *See* Pl.'s Ex. 1 at 137:2-16, ECF No. 49-4.

Ms. Cartaya prepared a Memorandum dated May 24, 2010, based on her performance evaluation of Plaintiff, and recommended that Plaintiff be terminated for falsification of records.

*See* Pl.'s Ex. 5 at Dep. Ex. 2, ECF No. 49-9 at 3 of 8.  According to Ms. Cartaya, from October

15, 2009 to May 17, 2010, "there were 215 times that material disposed in the biohazard log was

not signed of as having being QA reviewed."  *Id.*  Ms. Cartaya also listed several other

discrepancies in the logs.  *See id.*  She noted in Item 6 that the "weekly review documented by

the QAS on the log F-QA2100-a does not show any unacceptable deficiency documented."  *Id.*

Ms. Cartaya concluded:

> Item 6 above constitutes falsification of records since the review of the Biohazard
> waste log had not been completed as required and the QAS Activity Checklist
> does not indicate the reviews or information was incomplete.  According to SOP
> QA2100, the Biohazard Waste Disposal Log is to be verified weekly that the
> items are documented properly, that the log is complete and accurate and to
> ensure destruction manifests are received, maintained and documented in the log.
>
> . . .
>
> When it comes to falsification of records, the employee is deemed to have
> violated company policy that results in employment termination.  Thus, I
> recommend that this employee be dismissed for cause.

*Id.*

From May 25, 2010 to June 2, 2010, Plaintiff learned of problems with yellowing saline

bags in shipments, to which Fenwal explained that it resulted from "carmelization" of dextrose.

*See* Pl.'s Ex. 13, Interrog. No. 17, ECF No. 49-17 at 4 of 4.  Biotest's Standard Operating

Procedure ("SOP") specifically stated that the bags had to be clear.  *Id.*, Interrog. No. 16, ECF

No. 49-17 at 1-2 of 4.  Employees also discovered bags of Dextrose Hydrous among bags of

Anti-Coagulant solution bags in the same box.  *Id.*  Plaintiff found the placement alarming

because donors are administered Anti-Coagulant right before the blood is re-infused into a

donor's body while donors are given saline solution to replace the volume of plasma lost in the

donation.  *Id.*

On June 3, 2010, Plaintiff and a Biotest manager, Abel Salazar, broke open a C-cell

reservoir and saw a solvent stain as well as a drip next to it.  *See* Pl.'s Ex. 1 at 107:23-108:25, ECF No. 49-2; Pl.'s Ex. 3 at 19:14-24, ECF No. 49-7.  They put their fingers over the drip and felt a ridge, which caused Plaintiff to believe that what they were observing was absolutely glue. *See id.*  When they tried to scrape off the raised surface, it would not come off.  Def.'s Reply, Ex. B at 119:15-120:6, ECF No. 58-2.

On June 4, 2010, Biotest terminated Plaintiff from her employment.  Def.'s Mot., UF ¶ 4, ECF No. 44.  Ms. Poirier called and fired Plaintiff.  *See* Pl.'s Ex. 5 at 153:8-12, ECF No. 49-9. She did not tell Plaintiff that she had the opportunity to present her side.  *Id.*

After her termination, Plaintiff filled out an on-line "whistleblower" form on an FDA-maintained web page.  Def.'s Mot., UF ¶¶ 9-10, ECF No. 44.  Following submission of that form, the FDA sent an inspector, Teena Aiken, to New Mexico to interview Plaintiff on June 21, 2010.  *See* Def.'s Ex. A at 158:23-159:20, ECF No. 44-1.  Plaintiff's first contact with Ms. Aiken was on June 21, 2010, during which Plaintiff executed an affidavit, prepared by Ms. Aiken.  *See* Def.'s Mot., UF ¶¶ 7-8, ECF No. 44.  The affidavit described Plaintiff's concerns regarding the Fenwal reservoirs, in addition to concerns relating to discolored bags containing saline solution. *Id.*  Plaintiff noted at the end of her affidavit that, to her knowledge, there were no complaints or adverse events caused by either the C-cell reservoirs or the discolored bags containing saline. *See* Def.'s Mot., Ex. A at Ex. 41, ECF No. 44-1 at 19 of 19; Def.'s Reply, Ex. B at 161:22-162:2.

Plaintiff never performed any sort of chemical analysis to determine whether the "bridge" was an adhesive or a solvent.  Def.'s Reply, Ex. B at 106:22-107:1, ECF No. 58-2.  Other than looking at the "bridge," she never did anything to determine whether an adhesive was used to make the reservoirs.  *Id.* at 111:4-9.  She was not aware that any donor had any foreign substance go into their veins as a result of using one of the Fenwal reservoirs.  *See id.* at 146:11-14.

**B.      Biotest's Policies and Procedures**

On February 17, 2009, Plaintiff signed a document entitled "Human Resources Policy Manual Acknowledgment."  Def.'s Mot., Ex. A at 46:7-25 & Ex. 9, ECF No. 44-1.  In addition to acknowledging that the undersigned received and read Biotest's policy manual, the Acknowledgement Form stated:  "I understand I may resign at any time and the Company may terminate my employment at any time.  The at-will status of my employment can only be changed in writing, signed by an officer of the Company and myself."  Pl.'s Ex. 11, ECF No. 49-15.

The Human Resources Policy Manual states that the handbook "assures good management and fair treatment of all employees."  Pl.'s Ex. 10, ECF No. 49-14 at 2 of 11.  The manual urged employees to go directly to their supervisor to discuss job-related concerns, and thereafter, to Human Resources.  *See id.* at 3 of 11.  The manual had a Complaint Resolution Policy setting forth an open door policy for employees to report complaints to their immediate supervisor, and then to successively higher levels of management and Human Resources, if the problem is not initially resolved.  *See id.* at 6 of 11.   The Complaint Resolution Policy additionally provides:

> There will be no retaliation against an employee who has a complaint at any stage of this process.  All complaints will be investigated and appropriate action will be taken.
>
> [Biotest] also provides an avenue for employees to raise concerns and reassurance that they will be protected from reprisals or victimization for whistle blowing in good faith.

*Id.*

The Human Resources Policy Manual contains a separate section entitled "Retaliation" that states in part:

> Biotest Pharmaceuticals Corporation (BPC) will not tolerate unlawful retaliation against any employee who files a complaint, supports a co-worker in a complaint, or speaks as a witness in the investigation of a complaint.  It is also prohibited to discharge or in any manner discriminate against an employee who gives information about an alleged employer violation, causes a proceeding to be instituted against an employer, or testifies in a proceeding concerning an employer violation.

*Id.* at 10 of 11.

In the Performance Appraisals & Merit Increase Policy section, the manual sets forth a yearly performance review of employees by their immediate supervisor, to occur every year in March, in order "to help supervisors evaluate performance in an objective, consistent, and uniform manner and to provide feedback to employees on their performance."  *Id.* at 8 of 11. "The appraisal will be based on job performance and employee qualifications, which will be based on each position's job description and work standards."  *Id.*

Additionally, the manual includes a "Termination" section that, in part, provides:

> It is our policy to retain, to the extent consistent with Biotest Pharmaceuticals Corporation's requirements, the services of all employees who perform their duties efficiently and effectively.  However, it may become necessary under certain conditions to terminate employment for the good of the employee and/or BPC.
>
> . . .
>
> This employee termination procedure does not represent a contract between BPC and its employees.  Instead, it describes BPC's philosophy on termination decisions.  Each termination will be judged on its own merits.
>
> Termination at-will means that the BPC and its employees recognize that their employment relationship can be terminated, with or without cause, at any time, either at BPC's or the employees' option.  No manager or representative of BPC has the authority to enter into any employment agreement for any specific period of time or to make any arrangement contrary to the foregoing.

*Id.* at 11 of 11.

Biotest's "Behavior at Work" policy sets forth general work rules employees were

expected to follow.  *See* Pl.'s Ex. 9, ECF No. 49-13.  The policy states that if an employee

commits certain behaviors prohibited by the work rules, it "may be cause for disciplinary action

up to and including termination of employment."  *Id.*  Biotest's Human Resources Policy Manual

also contained a Code of Ethical Conduct.  *See* Pl.'s Ex. 10, ECF No. 49-14 at 1, 4-5 of 11.  The

Code of Ethical Conduct, among other things, provides:  "Biotest Pharmaceuticals will not

retaliate against you for reporting questionable behavior or suspected violations of this Code."

*Id.*  Plaintiff signed an "Acknowledgement of Receipt and Agreement to Abide by Code of

Ethical Conduct" on February 17, 2009.  Pl.'s Ex. 12, ECF No. 49-16.

 Biotest had a written "Progressive Discipline" policy.  *See* Pl.'s Resp., Ex. 1 at Ex. 14,

ECF No. 49-4 at 3 of 4.  The policy states:  "If employees knowingly and willingly violate

Biotest Pharmaceuticals Corporation (BPC) rules of conduct, their immediate supervisor will

discipline the employees in accordance with these general guidelines."  *Id.*  The Progressive

Discipline policy further provides:

> BPC will follow a progressive disciplinary program.  Correction in most cases
> will follow the attached progression unless circumstances warrant an acceleration
> of the corrective action.  Circumstances requiring corrective action should be
> discussed with Human Resources at or before the final written warning stage.
> Each situation will be handled on a case by case basis.
>
> The sequence of progressive disciplinary action should occur in the
> following steps:
>
> -- Verbal warning (documented)
> -- Written warning
> -- Final or Urgent Written warning
> -- Suspension
> -- Termination

*Id.*  The policy then describes the conduct that warrants the various levels of discipline and

explains the procedures for each level of discipline.  *See id.*, ECF No. 49-4 at 3-4 of 4.  The

policy provides that a supervisor may place an employee on a Performance Improvement Plan in

cases of major job performance problems and/or continued lack of improvement in performance or conduct.  *See id.*, ECF No. 49-4 at 4 of 4.

As for suspension and/or discharge, the Progressive Discipline policy states:

Flagrant disregard for policies and practices, such as gross insubordination or physical violence, may warrant suspension or immediate discharge depending on the severity of the circumstances.  Major offenses, such as dishonesty, breach of trust, unlawful distribution of drugs while conducting Company business, and possessing or transporting firearms in BPC vehicles, are so serious in nature that an employee may be discharged for the first violation.   Discharge from employment will also occur when the Performance Improvement Plan period progress reviews indicate that the employee's performance or conduct has not improved during the plan or at the end of the plan.

Major violations are considered to be employee actions that directly endanger the health and safety of any employee or significantly disrupt the orderly performance of work.  They include, but are not limited to, insubordination, falsification of employee or BPC records, theft of BPC or employee property, violation of safety rules, and the use of alcohol or illegal drugs on BPC premises at any time.

*Id.*  The policy provides that the "goal of disciplinary action is to correct problem situations and mistakes, and to minimize employees' loss of dignity and self-esteem," and that disciplinary actions "will be handled on a fair and equitable basis."  *Id.*  The policy further says that discharge will only be used as a final measure when reasonable remedial efforts have failed, except in situations that justify immediate termination.  *See id.*, Ex. 1 at Ex. 14, ECF No. 49-5 at 1 of 2.  It then explains:

BPC reserves the right to bypass the disciplinary steps and base its disciplinary action on the severity, frequency, or combination of infractions when circumstances warrant immediate action.  For serious offenses, such as fighting, theft, insubordination, violence, drug or alcohol abuse, etc., termination may be the first and only disciplinary step taken.  Any step or steps of the progressive disciplinary process may be skipped at the discretion of the company.

*Id.*

In practice, it was up to each individual center to determine what progressive discipline to administer before terminating an employee.  *See* Pl.'s Ex. 1 at 54:14-55:10, ECF No. 49-2.  The

12

Santa Fe Center had a "center specific" procedure of giving employees progressive discipline: first a verbal warning, then a certain number of verbal warnings, then a certain number of written warnings, and then termination.  *See* Pl.'s Ex. 1 at 48:4-19, ECF No. 49-1.  Dora Cartaya also believed that Biotest employees were normally terminated only for good cause.  *See* Pl.'s Ex. 4 at 38:8-10, ECF No. 49-8.  Ms. Cartaya testified that, prior to Plaintiff's termination, she fired four other employees for good cause, at least one of whom received progressive discipline before being terminated.  *See id.* at 37:11-40:25.

Sheila Poirier likewise testified that Biotest follows a progressive discipline policy.  Pl.'s Ex. 5 at 42:3-9, 44:2-21, ECF No. 49-9.  Angie Kovarik, a former Center Manager for the Biotest Santa Fe Center, and Richard Amador both testified that Biotest requires progressive discipline before an employee could be terminated and that Biotest never fired anybody without good cause.  *See* Pl.'s Ex. 3 at 19:14-20, ECF No. 49-7; Pl.'s Ex. 6 at 82:7-15, 90:15-91:12, ECF No. 49-10; Pl.'s Ex. 7 at 34:2-4, 36:8-15, ECF No. 49-11.  Robert Gallegos, a Biotest employee, also believes Biotest has a progressive discipline policy.  *See* Pl.'s Ex. 8 at 28:23-29:3, ECF No. 49-12.

Other than signing acknowledgements of receipt of the Human Resources Policy Manual and the Code of Ethical Conduct, Plaintiff does not recall signing any additional written document explicitly altering her at-will status that was also signed by an officer of Biotest.  *See* Def.'s Mot., Ex. A at 47:4-10, ECF No. 44-1; Pl.'s Ex. 11, ECF No. 49-15, Pl.'s Ex. 12, ECF No. 49-16.  Plaintiff nonetheless asserts that she was assured that she could only be terminated for just cause, and that any discipline would be based on a progressive discipline policy, assurances that she claims were reflected in the Behavior at Work and Code of Conduct policies.  *See* Def.'s Mot., Ex. B, Interrog. No. 10, ECF No. 44-2 at 5 of 8.  Plaintiff also felt that she had a permanent

position based on numerous conversations and emails in which it was discussed that she might assist in opening new centers across the country or transfer within the company, in which it was implied she might have "movement to the future with growth and training discussions," and in which she was given very positive and complementary feedback on her stellar job performance. *See id.*, Interrog. Nos. 10 and 12, ECF No. 44-2 at 5-7 of 8.   Based on conversations with corporate managers and her own manager, Plaintiff had a sense of security that if she did her job correctly and honestly that she would have continued employment with Biotest.  *See* Pl.'s Resp., Ex. 1 at 41:2-21, ECF No. 49-1.  Plaintiff believed she had an oral contract with Biotest because it was implied to her that she had a secure job for as long as she wanted it and did her job correctly.  *See id.* at 53:11-15.  In separate conversations with her manager Dora Cartaya and other corporate managers, each told her that if she did her job, which was to ensure the health and safety of donors and employees and ensure regulatory compliance, she would maintain employment with Biotest.  *See* Pl.'s Resp., Ex. 1 at 41:18-42:18, ECF No. 49-1.

### C.    Training

According to Biotest's SOPs, "QA management or designee, in coordination with center management, is responsible for training the QAS and monitoring their performance."  Pl.'s Ex. 3 at 18:19-19:11, ECF No. 49-7.   Ms. Cartaya was responsible for QA specialists being fully trained.  *See* Pl.'s Ex. 3 at 19:5-13, ECF No. 49-7; Pl.'s Ex. 4 at 148:2-6, ECF No. 49-8.

According to Angie Kovarik, who also trained with Plaintiff at the same Biotest center in San Antonio, Texas, Biotest never trained her on the SOP forms and documents that were the basis for Plaintiff's termination.  *See* Pl.'s Ex. 5 at Dep. Ex. 5, ECF No. 49-9 at 8 of 8.  All of the documents that Ms. Kovarik was trained were important resided in a separate binder labeled BIOHAZARDOUS WASTE LOG.  *Id.*

14

## II.    PROCEDURAL BACKGROUND

On June 1, 2012, Plaintiff filed suit against Biotest in the First Judicial District Court, State of New Mexico.  Compl., ECF No. 1-1.  Defendant removed the case based on diversity jurisdiction.  Notice of Removal ¶ 9, ECF No. 1.  Plaintiff asserts six causes of action arising from her termination:  (I) breach of contract; (II) wrongful discharge; (III) breach of the covenant of good faith and fair dealing; (IV) negligent supervision; (VI) intentional infliction of emotional distress ("IIED"); and (VII) prima facie tort ("PFT").[1]  Compl., ECF No. 1-1 at 2-9 of 10. Defendant has moved for summary judgment on all claims.  Def.'s Mot. 1, ECF No. 44.

## III.   STANDARD

Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted). Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  *Id.* at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists.  *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for

---

[1] There is no Count V in the Complaint.  To avoid confusion, the Court will refer to the Counts as listed in the Complaint.

trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson*, 477 U.S. at 248.

## IV.   ANALYSIS

Defendant argues that Plaintiff was an at-will employee, and as such, her claims for breach of contract, breach of an implied covenant of good faith and fair dealing, negligent supervision, and prima facie tort fail as a matter of law. Defendant further contends that it is entitled to summary judgment on Plaintiff's retaliatory discharge claim because Plaintiff cannot show that Defendant was aware of Plaintiff's communications with the FDA or that it terminated her because of her reports to the FDA. Finally, Defendant argues that Plaintiff has not met the elements for negligent supervision, intentional infliction of emotional distress, or prima facie tort, and those claims must be dismissed. The Court will first examine whether Plaintiff was an at-will employee before turning to Defendant's arguments on the merits of each individual claim.

### A.   Whether Plaintiff was an At-Will Employee

In New Mexico, the general rule is that employment "is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." *Garrity v. Overland Sheepskin Co. of Taos*, 1996-NMSC-032, ¶ 10, 917 P.2d 1382 (quoting *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)). "Courts have allowed an exception to the at-will employment rule when there is an implied contract arising out of an employer's promise not to fire an employee except for just cause." *Id.*

16

A promise or offer that creates an implied contract may be found to exist through written or oral representations, the parties' conduct, or a combination of representations and conduct. *Hartbarger*, 115 N.M. at 669, 857 P.2d at 780. Oral statements made by a party may be sufficient to create an implied contract. *See Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 24, 766 P.2d 280, 284 (1988). An implied contract, however, is created only where an employer creates a reasonable expectation. *See Hartbarger*, 115 N.M. at 672, 857 P.2d at 783. To give rise to a reasonable expectation, the promises or offers must be sufficiently definite, specific, or explicit. *See id.* Determining whether or not an oral statement is sufficiently specific or creates a reasonable expectation of an implied contract may require examining the express language used in a written contract, for example, to determine whether the written contract expressly forecloses reliance on oral representations. *See Garrity*, 1996-NMSC-032, ¶ 12 (employer's written personnel policy did not create reasonable expectation of implied contract given express reservation of right to terminate employee for any reason). Determining whether an implied contract exists is generally a question of fact based on the totality of circumstances. *Gormley v. Coca-Cola Enterprises*, 2004-NMCA-021, ¶ 20, 85 P.3d 252, *aff'd on other grounds by* 2005-NMSC-003, 109 P.3d 280.

Defendant argues that its Human Resources Policy Manual explicitly states that employment at Biotest is at-will, that the policies set forth in the manual are not intended to be an express or implied contract, and that no changes in Biotest's employment-at-will policy will be effective unless in writing and signed by a Biotest officer. Such disclaimers, while evidence of at-will status, are not necessarily conclusive where there is also evidence of other affirmative representations in a handbook describing procedural safeguards and substantive standards. *See Beggs v. City of Portales*, 2009-NMSC-023, ¶ 20, 210 P.3d 798 ("[E]ven where a personnel

17

manual purports to disclaim any intentions of forming contractual obligations enforceable against an employer, a fact finder may still look to the totality of the parties' statements and actions, including the contents of a personnel manual, to determine whether contractual obligations were created."); *Mealand v. Eastern New Mexico Med. Ctr.*, 2001-NMCA-089, ¶ 11, 33 P.3d 285 ("Reliance on disclaimers and qualifying words and phrases to negate expectations generated by other statements can be risky; courts have declined to give dispositive effect to disclaimers, reasoning that a combination of disclaimers and promissory statements on the same subject results in a question of fact for the jury.").

In this case, the Court finds that a question of fact exists for the jury as to whether, despite the disclaimer of at-will status, Biotest created a reasonable expectation of termination only for cause through its representations in other portions of the handbook and through its conduct.  Biotest had a written Progressive Discipline policy that set out, with considerable detail, a multi-stage system of progressive discipline.  *See* Pl.'s Ex. 1 at Ex. 14, ECF No. 49-4 at 3-4 of 4.  The policy said that Biotest "*will follow* a progressive disciplinary program."  *Id.* at Ex. 14, ECF No. 49-4 at 3 of 4 (emphasis added).  If an employee violated Biotest's rules of conduct, "their immediate supervisor *will discipline* the employees in accordance with these general guidelines."  *Id.* (emphasis added).  Contrary to Defendant's argument, the use of the phrase "general guidelines" does not necessarily undermine the mandatory nature of the progressive disciplinary program that supervisors "will follow."  There is thus evidence in the language of the Progressive Disciplinary policy indicating the policy was mandatory.

In addition to setting forth certain procedures, the Progressive Discipline policy provided an extensive list of examples of conduct that could result in disciplinary action or termination. *See id.* at Ex. 14, ECF No. 49-4 at 3-4 of 4.  Similar examples of inappropriate workplace

conduct were set forth in the Behavior at Work section of the Human Resources Policy Manual. *See* Pl.'s Ex. 9, ECF No. 49-13.  Although circumstances could warrant immediate termination, the policy outlined the types of "major offenses" or "major violations" that could trigger immediate dismissal based on a first violation.  *See* Pl.'s Ex. 1 at Ex. 14, ECF No. 49-4 at 3-4 of 4.  A jury could find that this is evidence that Biotest would follow its progressive discipline policies before terminating an employee, except in situations involving major offenses—where the employee could be terminated without progressive discipline.

In addition, there is evidence that the practice and custom of Biotest was to terminate employees only for cause, and generally after progressive discipline. Dora Cartaya testified that Biotest employees were normally terminated only for good cause, and that she herself had fired four other employees for good cause, at least one of whom received progressive discipline before his or her termination.  *See* Pl.'s Ex. 4 at 37:11-40:25 & 38:8-10, ECF No. 49-8.  Other managers and employees, including Sheila Poirier, Angie Kovarik, Richard Amador, and Robert Gallegos, confirmed that Biotest follows a progressive discipline policy and that Biotest only fired employees for good cause.  *See* Pl.'s Ex. 5 at 42:3-9, 44:2-21, ECF No. 49-9; Pl.'s Ex. 6 at 82:7-15, 90:15-91:12, ECF No. 49-10; Pl.'s Ex. 7 at 34:2-4, 36:8-15, ECF No. 49-11; Pl.'s Ex. 8 at 28:23-29:3, ECF No. 49-12.  There is thus a question of fact as to whether it was mandatory that termination must be for cause.

Furthermore, the Human Resources Policy Manual also expressly provided assurance that employees would be protected from reprisals for whistle blowing in good faith.  *See* Pl.'s Ex. 10, ECF No. 49-14 at 6 of 11.  Accordingly, there is an additional question of fact as to whether Biotest created a contract term that prohibited firing an employee for raising questions of public safety concerning Biotest practices.

19

In sum, this case falls within the line of cases in which, despite a disclaimer in a handbook that employment is at will, a genuine issue of material fact exists as to whether the employer and employee had an implied contract that the employer would only terminate the employee for just cause. *Cf. West v. Washington Tru Solutions, LLC*, 2010-NMCA-001, ¶¶ 14-20, 224 P.3d 651 (2009) (holding that, despite disclaimer that employment was terminable at will, question of fact existed for jury as to whether implied contract to terminate only for cause existed based on employer's statements in handbook and training session and employer's practice of terminating only for cause); *Mealand*, 2001-NMCA-089, ¶ 20 ("To summarize, ENMMC promulgated an employee handbook containing detailed statements that could reasonably be understood as imposing substantive and procedural limitations on its common-law right to discharge employees at will. Although the handbook also contains qualifying language, the overall effect of the handbook is to create genuine issues of fact as to whether Plaintiff could be terminated only after meaningful prior review by ENMMC's human resources department and only if that review established reasonable grounds to believe that Plaintiff had engaged in the alleged misconduct."); *Kiedrowski v. Citizens Bank*, 119 N.M. 572, 575-77, 893 P.2d 468, 471-73 (Ct. App. 1995) (holding that, despite disclaimer in handbook that employees could be discharged at any time and for any reason, question of fact should have gone to jury as to whether implied contract to dismiss only for cause existed based on handbook's detailed progressive disciplinary procedures that managers must follow, bank instructed managers to follow handbook's procedures, and custom of bank was to follow handbook's disciplinary procedures).

### B.      Breach of Contract

Defendant's primary argument for summary judgment on Plaintiff's breach-of-contract

claim is that Plaintiff was an at-will employee.  Because the Court determines that the at-will employment status of Plaintiff is a question of fact, the Court will not grant summary judgment on that ground.  Alternatively, Defendant argues that, even if Biotest's policies are construed as a contract, Biotest was within its rights to terminate Plaintiff's employment without utilizing progressive discipline because she was fired for falsifying company documents, a ground specifically outlined as a "major offense" subjecting an employee to immediate termination.

Although falsifying company documents was the stated ground for Plaintiff's termination, the record contains evidence that the proffered reason may have been a pretext. Plaintiff submitted evidence that Biotest never trained its employees on the SOP forms and documents that were the basis for Plaintiff's termination.  Moreover, the timing of Plaintiff's performance evaluation coincided with Ms. Cartaya's anger over Plaintiff pursuing the issue of the quality of the C-cell reservoirs, indicating that Ms. Cartaya may have created a pre-textual reason to fire Plaintiff.  Therefore, a question of fact exists for a jury to determine whether Biotest was within its contractual rights to terminate Plaintiff's employment for cause without utilizing progressive discipline.  Consequently, the Court will deny Defendant's request for summary judgment on Plaintiff's breach-of-contract claim.

### C.    Wrongful Discharge

New Mexico recognizes the tort of retaliatory discharge in which a discharged at-will employee may recover in tort when her discharge contravenes a clear mandate of public policy. *Chavez v. Manville Products Corp.*, 108 N.M. 643, 647, 777 P.2d 371, 375 (1989).  Retaliatory discharge is a "narrow exception" to the employment at will rule.  *Shovelin v. Central New Mexico Elec. Coop., Inc.*, 115 N.M. 293, 304, 850 P.2d 996, 1007 (1993).  To prevail on a retaliatory discharge claim, an employee must show that she was discharged because she

performed an act that public policy has authorized or would encourage, or because she refused to do something required of her by her employer that public policy would condemn. *Chavez*, 108 N.M. at 647, 777 P.2d at 375 (quoting *Vigil v. Arzola*, 102 N.M. 682, 689, 699 P.2d 613, 620 (N.M. Ct. App. 1983), *rev'd on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984)). The employee additionally must demonstrate that the employer knew or suspected that the employee's action involved a protected activity and that there was a causal connection between her actions and the retaliatory discharge by the employer. *Shovelin*, 115 N.M. at 303, 850 P.2d at 1006; *Weidler v. Big J Enterprises, Inc.*, 1998-NMCA-021, ¶ 23, 953 P.2d 1089 (1997).

The linchpin of the retaliatory discharge tort "is whether by discharging the complaining employee the employer violated a 'clear mandate of public policy.'" *Shovelin*, 115 N.M. at 303, 850 P.2d at 1006 (quoting *Vigil*, 102 N.M. at 688, 699 P.2d at 619). "A clear mandate of public policy sufficient to support a claim of retaliatory discharge may be gleaned from the enactments of the legislature and the decisions of the courts" and may fall into one of the following categories: (i) legislation defining public policy and providing a remedy for violation of that policy; (ii) legislation providing protection of an employee without specifying a remedy; (iii) legislation defining a public policy without specifying either a right or remedy, requiring judicial recognition of both; and (iv) instances where there is no expression of public policy and the judiciary would have to imply a right and remedy. *Id.* Not every expression of public policy, even if set forth in a statute, will suffice to state a claim for retaliatory discharge. *Id.* The employee must identify a specific expression of public policy in order to state a claim. *See id.* at 303-04, 850 P.2d at 1006-07.

Defendant first contends that Plaintiff cannot bring this claim if she is not an at-will employee. There is a question of fact, however, as to whether Plaintiff is an at-will employee,

and Plaintiff may plead causes of action in the alternative.  *See Boudar v. E.G. & G., Inc.*, 106 N.M. 279, 283, 742 P.2d 491, 495 (1987) ("[W]e held that the tort of retaliatory discharge is unnecessary and inapplicable if an employee is protected from wrongful discharge by an employment contract.  Neither case, however, prevents a complainant . . . from alleging and presenting evidence on a claim sounding in both tort and contract.").  Consequently, the Court will not dismiss Plaintiff's wrongful discharge claim as a matter of law based on the argument concerning Plaintiff's at-will status.

Defendant next argues that it is entitled to summary judgment on Plaintiff's wrongful discharge claim because it was not aware of Plaintiff's communications to the FDA prior to her termination, and thus, it did not discharge her because of that conduct.  Plaintiff concedes that the evidence has not borne out her allegation that she was fired for her communications with the FDA.  Nevertheless, Plaintiff contends that summary judgment is not appropriate because the evidence shows she was discharged for reporting public safety issues internally to her supervisors.  In reply, Defendant asserts that it is entitled to summary judgment, even on this new theory, because Plaintiff's concerns were baseless and devoid of any scientific or factual foundation, and consequently, her concerns did not constitute activity that public policy would condone.

Public policy favors protecting the lives of citizens, and reporting actions that threaten the public safety support an action for retaliatory discharge.  *See Gutierrez v. Sundancer Indian Jewelry, Inc.*, 117 N.M. 41, 47, 868 P.2d 1266, 1272 (Ct. App. 1993) (employee discharged for reporting unsafe working conditions to appropriate public agency furthers public interest in safe workplace and may serve as basis for retaliatory-discharge suit); *Garrity*, 1996-NMSC-032, ¶ 17 (holding that plaintiffs, who alleged retaliation for reporting suspected criminal activity, alleged

interest for which there is clear mandate of public policy and citing with approval *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385, 388-89 (1980), for its holding that reporting violations of state food-labeling laws was important public-policy concern that supported action for retaliatory discharge).  Reporting to a public agency is not a necessary predicate for retaliatory-discharge suit; an employee may be able to bring a retaliatory-discharge suit, even where the employee reports information only to her supervisor.  *See Garrity*, 1996-NMSC-032, ¶ 23.

"[W]hen evaluating a retaliatory-discharge claim in which an employee has asserted a clear mandate of public policy but did not alert the appropriate public officials, the courts must determine on a case-by-case basis whether the employee's actions furthered some singularly public purpose or served primarily to benefit the private interest of the employer or employee."
*Id.* ¶ 24.  As the New Mexico Supreme Court explained:

> [T]here is a tension between the obvious societal benefits in having employees with access to information expose activities which may be illegal or which may jeopardize health and safety, and accepted concepts of employee loyalty; nevertheless we conclude that on balance *actions which enhance the enforcement of our laws or expose unsafe conditions, or otherwise serve some singularly public purpose*, will inure to the benefit of the public.

*Id.* (quoting *Gutierrez*, 117 N.M. at 48, 868 P.2d at 1273) (emphasis in original).

Although this Court agrees with the general principle that exposing unsafe conditions that may hurt citizens is a public interest, and that Plaintiff's internal concerns shared with management as a general proposition may support a retaliatory discharge claim, here Plaintiff has produced no evidence indicating that her inquiries actually exposed wrongdoing on the part of Defendant.  Plaintiff must show that by reporting her concerns to her employer, she furthered the public policy of protecting the general public from the dangers of the substance observed in the C-cell reservoirs.  *Cf. Garrity*, 1996-NMSC-032, ¶ 26 ("The Garritys have not demonstrated

24

that by reporting their suspicions to their employer they would have furthered the public policy of preventing crimes or protecting the general public from the social evils associated with illegal drug use.").  Plaintiff has produced evidence that she had concerns that the C-cells contained a glue-like substance that she believed could cause harm, but she has not established that Defendant's continued use of C-cell reservoirs actually placed the public in harm.  Although her concerns were sufficient to cause the FDA to send an investigator to Plaintiff, Plaintiff has not shown the Court any evidence that the FDA concluded there was a public safety risk.  Plaintiff herself acknowledges that she was not certain that the substance actually could harm the public and that she was not aware that there were any instances of the substance harming any member of the public.  At the summary judgment stage, conjecture is not enough.  In sum, Plaintiff has not established any kind of factual basis to indicate any wrongdoing by Defendant on which she could blow the proverbial whistle.  *Cf. Garrity*, 1996-NMSC-032, ¶ 18 (citing Henry H. Perritt. Jr., *Employee Dismissal Law and Practice* §§ 5.1, 5.17 (2d ed. 1987 & Supp.1989), with approval for proposition that, "to establish prima facie case, employee must show that discharge actually placed asserted public-policy interest in jeopardy under the facts of the case"); *McPeek v. Hubbard Museum*, No. 27,424, 2010 WL 4060312, at *4 (N.M. Ct. App. Mar. 16, 2010) (unpublished opinion) ("In the present case, Plaintiffs failed to establish a prima facie case that Defendant had engaged in any wrongdoing at all. In the absence of wrongful conduct, we cannot say that public policy would encourage Plaintiffs' reporting of Defendant's actions. Moreover, allowing Plaintiff's' claim to proceed under these circumstances would unduly broaden the retaliatory discharge exception to at-will employment."). *See also Palmer v. Brown*, 752 P.2d 685, 690 (1988) (explaining that, to maintain retaliatory discharge claim under Kansas law, "an employee has the burden of proving by clear and convincing evidence, under the facts of the

case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare").[2]   The Court will therefore grant summary judgment to Defendant on Plaintiff's retaliatory discharge claim.

### D.      Breach of Covenant of Good Faith and Fair Dealing

Defendant argues that, because Plaintiff was an at-will employee, her claims for Breach of Implied Covenant of Good Faith and Fair Dealing must fail.  As discussed *supra*, this Court finds a question of fact exists as to whether Plaintiff was an at-will employee, and therefore, the Court will deny Defendant's request to grant it summary judgment based on that argument.

### D.      Negligent Supervision

The proper standard for determining whether an employer should be held liable for negligent supervision is whether the employer knew or reasonably should have known that some harm might be caused by the acts or omissions of the employee who is entrusted with such position.  *Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 36, 91 P.3d 58.  To prove negligent supervision, Plaintiff must prove the following:  (1) Defendant was the employer of the employee; (2) Defendant knew or should have known that supervising that employee would create an unreasonable risk of injury to Plaintiff; (3) Defendant failed to use ordinary care in supervising the employee; and (4) Defendant's negligence in supervising the employee was a cause of Plaintiff's injury.  *See* N.M. U.J.I. Civ. 13-1647.  "A court may decide questions of negligence and proximate cause, if no facts are presented that could allow a reasonable jury to find proximate cause."  *Calkins v. Cox Estates*, 110 N.M. 59, 65 n.6, 792 P.2d 36, 42 n. 6 (1990).

---

[2] Finally, as to the saline bags, Plaintiff has not shown that she raised any safety concerns to management prior to her termination, and thus, that allegation does not support a retaliatory discharge claim.

Plaintiff argues her negligent supervision claim should survive because she was fired for falsifying documents on which she had received no training, and it was Ms. Cartaya's responsibility to ensure Plaintiff received such training.  Plaintiff contends she took her safety concerns to upper management and human resources, which did not respond, and then shortly thereafter, she was terminated.  Plaintiff asserts, "These facts establish the elements of negligent supervision on the part of Defendant in its failure to monitor Cartaya and take actions to correct her when problems were brought to Defendant[']s attention by Plaintiff."  Pl.'s Resp. 22, ECF No. 49.  Defendant contends that Plaintiff has not shown that it had prior notice that Ms. Cartaya presented an unreasonable risk of injury to Plaintiff, that Defendant was aware that Plaintiff was not trained on the logs in question, or that Defendant was aware that Ms. Cartaya failed to provide appropriate training to her.

The Court agrees that the record does not support a claim for negligent supervision.  There is no evidence that Biotest knew or reasonably should have known that Ms. Cartaya might harm Plaintiff by failing to train her on the waste logs.  The evidence that Plaintiff made safety complaints to upper management does not show that upper management was aware that Ms. Cartaya was not training her employees properly on the waste logs.  Nor is there evidence that Biotest was aware that Ms. Cartaya was firing employees on pretextual bases, such that it should have known that Ms. Cartaya presented a potential harm to Plaintiff by firing her for baseless reasons.  In sum, Plaintiff does not provide an evidentiary basis for finding that Biotest was negligent in supervising Ms. Cartaya.  The Court will therefore grant summary judgment on Defendant on Plaintiff's negligent supervision claim.

### E.      Intentional Infliction of Emotional Distress

To prove a claim for intentional infliction of emotional distress, the plaintiff must show

that the defendant's conduct was extreme and outrageous under the circumstances; the defendant acted intentionally or recklessly; and as a result of the conduct the plaintiff experienced severe emotional distress. *Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 47, 976 P.2d 999.  An employer can be held liable for an employee's intentional infliction of emotional distress. *Deflon v. Danka Corp. Inc.*, 1 F.App'x 807, 822 (10th Cir. Jan. 5, 2001) (unpublished opinion) (citing *Coates*, 976 P.2d at 1009).  Extreme and outrageous conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Stieber v. Journal Pub. Co.*, 120 N.M. 270, 274, 901 P.2d 201, 205 (Ct. App. 1995) (citation and quotations omitted); N.M. U.J.I. 13-1628.  Only in extreme circumstances can the act of firing of an employee support an IIED claim. *Trujillo v. Northern Rio Arriba Elec. Co-op, Inc.*, 2002-NMSC-004, ¶ 27, 41 P.3d 333 (2001).  The "severe" emotional distress required to recover under the IIED tort means that a reasonable person would be "unable to cope adequately with the mental distress engendered by the circumstances" and no reasonable person could be expected to endure it. *Id.* ¶ 28 (quotations omitted).

Defendant argues that the evidence does not establish that its conduct was extreme or outrageous or that Plaintiff suffered the requisite severe emotional distress.  Although Plaintiff suffered from stress, depression, anxiety, weight-gain, and acne and had sleepless nights, she did not see any medical providers, instead seeking the assistance of spiritual leaders.  This distress is legally insufficient under New Mexico law to establish the third element for an IIED claim. *Cf. Trujillo*, 2002-NMSC-004, ¶ 28 (concluding that plaintiff's distress was insufficiently severe to establish IIED claim where plaintiff felt lousy and depressed, had Prozac prescribed for him, slept long hours, and had erratic eating habits).  Defendant is therefore entitled to summary

judgment on Plaintiff's IIED claim, and this Court need not consider whether Plaintiff could satisfy the first element of the IIED tort.

**F.      Prima Facie Tort**

To establish a claim for prima facie tort, a plaintiff must prove the following: (1) an intentional, lawful act by defendant; (2) an intent to injure the plaintiff; (3) injury to the plaintiff as a result of the intentional act; and (4) the absence of sufficient justification for the injurious act.  *See Lexington Ins. Co. v. Rummel*, 1997-NMSC-043, ¶ 10, 945 P.2d 992; *Schmitz v. Smentowski*, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990).  "Prima facie tort is intended to provide a remedy for persons harmed by acts that are intentional and malicious, but otherwise lawful, which 'fall outside of the rigid traditional intentional tort categories.'"  *Bogle v. Summit Inv. Co., LLC*, 2005-NMCA-024, ¶ 22, 107 P.3d 520 (quoting *Martinez v. N. Rio Arriba Elec. Coop., Inc*., 2002-NMCA-083, ¶ 24, 51 P.3d 1164).  As such, prima face tort "should be used to address wrongs that otherwise 'escaped categorization,' but 'should not be used to evade stringent requirements of other established doctrines of law.'"  *Id.* (quoting *Schmitz*, 109 N.M. at 396, 398, 785 P.2d at 736, 738).

Defendant argues that Plaintiff is an at-will employee, and as such, she cannot show that she had a legally protected interest in continued employment or in termination only for just cause.  Plaintiff contends that a question of fact exists as to whether Plaintiff is an at-will employee, and thus, Defendant is not entitled to summary judgment on this claim.  Although the Court agrees that Plaintiff's at-will status is a question for the jury, the fact that prima facie tort cannot lie under New Mexico law where the employment relationship is at will ultimately dooms Plaintiff's claim for prima facie tort in this employment context.

If Plaintiff is an at-will employee, Defendant is entitled to judgment as a matter of law

because "New Mexico law does not recognize a claim for prima facie tort in employment-at-will situations."  *See Cordova v. PNM Elec. and Gas Servs.*, 72 F. App'x 789, *793 (10th Cir. July 31, 2003) (unpublished decision) (and cases cited therein).  On the other hand, if Plaintiff had an implied contract to terminate her employment only with cause, as she alleges in her complaint, and she proves that she was terminated without cause, then she will prevail on her breach of contract claim.  In that event, Defendant would be entitled to dismissal of the prima facie tort claim for two reasons:  (i) her termination would be "unlawful" conduct by her employer, and she could not meet the first element for prima facie tort; and (ii) prima facie tort is only available when other traditional tort categories are unavailable.  *See Dimond v. Innovative Servs., Inc.*, No. Civ. 95-0071 JC/WWD, 1995 WL 877501, at *1 (D.N.M. July 5, 1995) ("If an express or implied contract of employment were applicable to Plaintiff, his termination was allegedly caused by 'unlawful' conduct of the defendant employer.  The essential element of a *prima facie* tort – harm resulting from a *lawful* act – could not be satisfied."); *Bogle*, 2005-NMCA-024, ¶¶ 23-24 ("[I]f at the close of the evidence, plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted . . . on that cause and not under prima facie tort. . . . Plaintiff had a (successful) cause of action under breach of contract. Thus, existing causes of action provided reasonable avenues to a remedy for the asserted wrongful conduct.  As such, there was simply no need to resort to prima facie tort."); *Healthsource, Inc. v. X-Ray Assocs. of New Mexico*, 2005-NMCA-097, ¶ 36, 116 P.3d 861 (noting that court did not err in dismissing plaintiff's prima facie tort claim because plaintiff did not assert separate factual basis to support claim and claim duplicated other claims made by plaintiff); *Stock v. Grantham*, 1998-NMCA-081, ¶¶ 38-39, 964 P.2d 125 (affirming dismissal of prima facie tort claim because it was improper means of evading elements of other causes of

action).  On the other hand, if Plaintiff establishes an implied contract, but is unable to show breach of the contract because her employer terminated her with cause, then she cannot meet the fourth element required for prima facie tort – the absence of sufficient justification for the injurious act.  Consequently, in this employment context, Plaintiff cannot succeed on her prima facie tort claim as a matter of law and Defendant is entitled to judgment on this claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion and Memorandum Brief for Summary Judgment (**ECF No. 44**) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Defendant's request for summary judgment is **GRANTED** as to Plaintiff's claims for wrongful discharge, negligent supervision, intentional infliction of emotional distress, and prima facie tort.

2. Defendant's request for summary judgment is **DENIED** as to Plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

3. Plaintiff's claims for wrongful discharge (Count II), negligent supervision (Count IV), intentional infliction of emotional distress (Count VI), and prima facie tort (Count VII) are therefore **DISMISSED WITH PREJUDICE**.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**